# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2011

## STATE OF TENNESSEE v. CHRISTOPHER MARCH

Appeal from the Madison County Circuit Court
No. 08-568      Roy B. Morgan, Jr., Judge

**No. W2010-01543-CCA-R3-CD  - Filed January 20, 2012**

The Defendant, Christopher March, was convicted by a Madison County Circuit Court jury of two counts of burglary, Class D felonies; five counts of forgery of $1000 or more but less than $10,000, Class D felonies; forgery of less than $1000, a Class E felony; theft of property under $500, a Class A misdemeanor; and attempted theft under $500, a Class B misdemeanor.  The trial court imposed a seven-year sentence for each of the burglary and Class D felony forgery convictions, four years for Class E felony forgery, eleven months and twenty-nine days for theft, and six months for attempted theft.  The trial court imposed partial consecutive sentencing yielding an effective twenty-one-year sentence.  On appeal, the Defendant contends that (1) the evidence was insufficient to support the burglary convictions and (2) the trial court erred by imposing excessive sentences.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

George M. Googe, District Public Defender; Susan D. Korsnes, Assistant Public Defender (at trial); and Joseph T. Howell, Jackson, Tennessee (on appeal), for the appellant, Christopher March.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody Pickens and Rolf Hazlehurst, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

Jackson Police Officer Daniel Brown testified that on Sunday, June 29, 2008, he responded to a burglary call at Macedonia Baptist Church. He said he met with a staff member, Harriet Croom, and other representatives of the church. He said they reported that a roll of stamps was missing and that checks numbered 9789 through 9825 were missing from the church's checkbook. He said the lock on the office from which the items were taken could be opened without force or damage to the lock.

On cross-examination, Officer Brown testified that a retired officer and "several ladies . . . counting money and taking care of church business" were present. He said he did not determine how many people had keys to the church. He did not determine how many times a week people used the church for religious services, funerals, or weddings, but he said that he worked in the church's district and knew that it was a "social place." He said the room in which the checks were kept was "maintained and locked."

Harriett Croom testified that she was the financial secretary of Macedonia Baptist Church. She said that there was a lock on the door to her office in the church and that the checks were kept in a locked file cabinet inside the office. She said that Mary Love, Reverend Harold Brock, Nesbie Teamer, and Robert March also worked in the office or had access to it. She said Reverend Brock and Mr. Teamer each had a key to the file cabinet but was unsure whether Ms. Love had a key. She said Robert March opened and closed the building before and after church services.

Ms. Croom testified that she discovered that the checks and stamps were missing on Sunday, June 29, 2008, at approximately 11:25 a.m. and that she notified the finance committee and the police. She said the previous Wednesday was the last time she had been in the office before June 29. She said that she was printing bulletins on that Wednesday and that the last time she had been inside the file cabinet was Sunday, June 22, 2008.

Ms. Croom testified that she recognized the Defendant and identified him in the courtroom. She said she knew the Defendant's parents, Robert and Sarah March.[1] She said that Robert March was the church's custodian and a trustee.

Ms. Croom identified check number 9790, which was written on the church's Regions Bank account for $1400. She said that her name appeared on the signature line but that it was spelled incorrectly and that it was not her signature. She said that she was also familiar

---

[1]The Defendant's mother is identified in the record as Sarah March and Sara March. We have used Sarah March, the spelling of her name as it appears in the trial transcript.

with Ms. Love's signature and that the second signature on the check was not in Ms. Love's handwriting. She also identified the following checks, all written to the Defendant for the stated amounts: #9793 for $600, #9796 for $1800, #9801 for $1300, #9805 for $1200, and #9807 for $1400. She said that Ms. Love, Mr. Teamer, Reverend Brock, and she were authorized to write checks and that a check required two signatures.

Ms. Croom testified that she completed an affidavit of forgery on July 14, 2008, which she identified, and she verified that the signature on the affidavit was hers. She said the total amount of the checks was $7700. She said that once the checks were discovered missing, a stop payment was placed on the account.

On cross-examination, Ms. Croom testified that the lock on the file cabinet was not broken when she discovered the checks were missing. She said that to her knowledge, the Defendant did not have a key to the file cabinet. She acknowledged that the church had employed the Defendant to paint, but she did not know of his being hired to do anything else. She said that the Defendant was paid with checks and that the payment was approved by the finance committee. She acknowledged that she had seen the Defendant around the church assisting his father. She agreed the computer in her office was undisturbed. She said the stamps had also been inside the locked file cabinet.

On redirect examination, Ms. Croom testified that she was not aware of the Defendant's doing $7700 of work for the church. She agreed the Defendant had been hired to do "little odds and ends." She recalled only writing one check to the Defendant for work at the church. She said that the Defendant's father had the Defendant paint the church's restrooms and kitchen and that it was not during the time period relevant to the missing items. She said that none of the checks in issue were for payment for the painting work.

Mary Love testified that she was a member of Macedonia Baptist Church and was the chairperson of its finance committee. She said that checks must be signed by two people and that she was authorized to sign checks. She was shown the six checks that were introduced as exhibits and denied signing them. She said she knew the Defendant by sight, not personally, and she identified him in the courtroom. She said she knew him through his parents, who attended the church.

On cross-examination, Ms. Love testified that she signed paperwork relating to the missing checks. She said Ms. Croom, Mr. Teamer, and she had keys to the file cabinet. She said that she saw the file cabinet after the checks were taken and that to her knowledge, it was not damaged. She said the key to the file cabinet still worked.

LaTonya Houston testified that she was a teller for Regions Bank. She said that when someone presented a check for payment, the standard procedure was to ask if the person was a customer and if so, to obtain their account number and identification. She said that if the person were not a customer, information would have to be entered into the bank's computer. She said a check would not be cashed if the person's identification did not match the name of the payee on the check. She said that when a check was cashed, it was imprinted with the name of the teller, the branch of the bank, the date and time, and the payee's driver's license number.

Ms. Houston testified that she was the teller who cashed checks 9790 on June 25, 2008, and 9807 on June 30, 2008. She identified the driver's license number listed on the checks as belonging to the Defendant.

Sandra Taylor testified that she was a head teller for Regions Bank. She said that identification would be required of a person who presented a check to be cashed and that a thumb print and a five dollar fee would be required if the person were not a bank customer. She said she cashed check 9793, made payable to the Defendant, on June 24, 2008. She identified the check and said she wrote on the back of the check the driver's license number, date of birth, and the expiration date. She said she would not have cashed the check if the person who presented it did not have identification that he was Christopher March. A copy of the check was received as an exhibit. The driver's license number and date of birth that Ms. Taylor identified on the back of the check were the same as the driver's license number and date of birth as those listed on the other copies of checks payable to the Defendant that were admitted as exhibits.

Mesheika Ragland testified that in June 2008, she was employed at Regions Bank as a teller supervisor. She identified check 9796 and said that on June 25, 2008, she cashed the check for a person named Christopher March, whose driver's license number she recorded on the back of the check.

Paige Crider testified that she worked for Regions Bank on June 27, 2008, and that she cashed check 9801, payable to the Defendant, after obtaining proper identification. She said that she did not write a driver's license number on the check but that she probably entered it into the bank's computer system.

Javonna Wilkes testified that on June 29, 2008, she was a branch operations representative and teller supervisor for Regions Bank. She said that on that date, she cashed check 9805, payable to the Defendant, after she viewed his Tennessee driver's license.

Ronnie Gross testified that he was a criminal investigator manager for Regions Bank. He said he had the ability to review video tape that corresponded with specific bank transactions. He identified still photographs taken from the bank's video surveillance records relative to the church's checks that were cashed in this case. The photographs were received as exhibits.

Jackson Police Lieutenant Randy Lampley testified that he was assigned to the Financial Crimes Unit and investigated the checks at issue. He said he interviewed the Defendant about the six checks in question. He said that the Defendant admitted forging the checks and that he had the Defendant memorialize the admission by initialing the checks and writing the date of the interview. He said he confirmed that the Defendant's driver's license number was the same as the driver's license number on the checks.

On cross-examination, Lt. Lampley testified that the Defendant waived his right to counsel and admitted cashing the checks. He said the Defendant denied committing or knowing anything about the burglary of the church. He said that Ms. Croom was the only person from the church to whom he spoke and that he did not ask her if someone broke into the file cabinet.

Jackson Police Officer Mark Wray testified that on July 12, 2008, at 8:35 a.m., he responded to a burglary call at Macedonia Baptist Church. He said he took photographs of damage to the church office. He said the damage was to the door between the hallway and the office and to the doorknob. The photographs were received as evidence.

On cross-examination, Officer Wray testified that he was not able to determine how the person entered the church building. He said Rosetta Mitchell, the church's secretary, told him that the damage was new and that she left the office locked at 4:00 p.m. the previous day. He said Ms. Mitchell told him that it was common for exterior doors to be left open and that the person might not have had to force his or her way into the building. He said he did not collect fingerprint evidence.

Rosetta Mitchell testified that she was Macedonia Baptist Church's secretary. She said she had keys to everything in the church, including the financial secretary's office. She said she called the police on July 12, 2008, because someone had broken into her office. She said her office was not the same place as the "finance room." She said that when she entered her office, papers and items were scattered about and her cup of pennies had been thrown around the office. She said there was visible damage to the door. She later noticed that her radio was missing. She identified photographs of her office as it appeared on July 12, and the photographs were received as exhibits.

Ms. Mitchell testified that the day after the police were at the church, she turned on her computer and a Palm Pilot form with the Defendant's name appeared. She said this had not been on her computer when she left on July 11 at 2:30 p.m. She said she printed it and gave it to a police officer who came to the church that day. She identified the printout, and it was received as an exhibit.

On cross-examination, Ms. Mitchell testified that she did not recall the Defendant and his father being at the church on July 11, 2008. She said that she did not know whether they were there on July 12 but that they had keys to the church and her office. She said she would have objected to the Defendant's using the church computer with his Palm Pilot because she thought it was an inappropriate use. She said that one of the church's classes had a function at the church on July 12 and acknowledged that the church's gym was used frequently, although the gym was not left open for the general public to use and permission was required. She said a radio was missing from her office on July 12.

Sarah March, the Defendant's mother, testified on his behalf that she, her husband, and the Defendant unlocked the church daily and set up for church events. She said that after the Defendant moved home, she and her husband began allowing the Defendant to unlock and lock the church. Ms. March said her husband was paralyzed below his waist and used a wheelchair. She said he supervised work that was done at the church but was unable to do the work himself. She said the Defendant and her husband went to the church almost daily to perform repairs and maintenance. She said the Defendant painted several areas of the church and was paid for the labor. She said he painted for two weeks or more.

Ms. March testified that the office that was entered was connected to the gym. She said that she was not at the church on July 11 but that she took her husband there and picked him up later. She said she thought the Defendant was with her husband earlier that day.

On cross-examination, Ms. March testified that she and her husband were at the church when the Defendant painted but acknowledged that they did not stay all day. She could not pinpoint the date the Defendant did the painting but remembered that it was after the Defendant was released from incarceration and had been over a year ago. She said the painting did not take place in the same time period as the crimes alleged in this case.

Ms. March acknowledged that the Defendant had her keys to the church, which included keys to Reverend Brock's and Rosetta Mitchell's offices but not a key for the "financial room." Ms. March said that she had the key to the financial secretary's office but that she never went in it. She said she had once worked for the church as a custodian. She said that neither she nor her son were authorized to get checks from the financial secretary's office and agreed that if her son did so, his actions were unauthorized. She acknowledged

that preparing the church for events such as baptisms, weddings, and banquets did not require anyone to enter the financial secretary's office. When shown the six exhibits containing photographs of the person who cashed the checks at the bank, she identified the Defendant in five of them. She said that she could not see the face in one of the photographs and that she did not think the person was the Defendant.

Ms. March acknowledged that neither she nor her son were authorized to write checks on the church's account. She was unaware of the Defendant's performing any paid work for the church other than painting. On redirect examination, Ms. March testified that although she had a key to Harriet Croom's office, she did not have a key to the file cabinet.

The Defendant was convicted of two counts of burglary, five counts of forgery of $1000 or more but less than $10,000, forgery of less than $1000, theft of property under $500, and attempted theft under $500. The trial court imposed an effective twenty-one-year sentence. This appeal followed.

## I

In his first issue, the Defendant contends that the evidence is insufficient to support his two burglary convictions. The State counters that the proof is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Pertinent to this appeal,

> (a) A person commits burglary who, without the effective consent of the property owner:
>
> (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;

. . . or

> (3) Enters a building and commits or attempts to commit a felony, theft or assault.

T.C.A. § 39-14-402(a)(1), (3) (2010). "'Effective consent' means assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when . . . [i]nduced by deception or coercion." Id. § 39-11-106(9)(A) (2006) (amended 2009). Our supreme court has said that a defendant's guilt of burglary may be inferred if the defendant had exclusive, unexplained possession of recently stolen goods and "there exists a rational connection between possession and participation, when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." State v. James, 315 S.W.3d 440, 452 (Tenn. 2010).

The indictment charged the Defendant with burglaries occurring on June 22 through 29, 2008, and July 11, 2008. The Defendant argues that he is not guilty of the two counts of burglary because he had effective consent to enter the church at any time. The State argues that any consent the Defendant had to enter the church was not effective because it was induced by deception and because he exceeded the scope of the consent.

In the light most favorable to the State, the record reflects that the Defendant's family performed custodial and maintenance duties at the church. The Defendant was employed to paint at the church, but the project was completed before the time period involved in this case. Church officials were aware that the Defendant helped his parents open and close the church. The record also reflects that the church was frequently open for events but that it was not kept open for members of the general public to enter at other times. Both offices were secured when the church's staff was not using them, even if other parts of the church were unlocked and accessible.

A.    **June 22 through 29, 2008 Burglary**

With respect to the June 2008 burglary, the record reflects that the financial secretary's office was locked and that the checks were kept in a locked file cabinet. Ms. Love testified that she, Ms. Croom, and Mr. Teamer had keys to the file cabinet. Ms. Croom also identified Reverend Brock as having a file cabinet key but was unaware of the Defendant's having a file cabinet key. She said she locked the office when she left. The Defendant's mother, a former custodian at the church, testified that although she had a key to the financial office, she never had a reason to enter the office. She said she had no authority to enter the financial office to get checks and admitted that neither she nor the Defendant had authority to write checks.

We conclude that the evidence is sufficient to support the Defendant's conviction for the June burglary of the financial office. Although church officials were aware that the Defendant assisted his parents with their duties opening and closing the church and maintaining the premises, the Defendant acted outside the consent granted to his parents to enter the premises, and at least derivatively allowed to him. He entered the financial office and the locked file cabinet, even though the duties performed by the Defendant's parents with the Defendant's assistance were not financial in nature, and although he had no authority to write checks on behalf of the church. The Defendant exceeded the scope of the consent to enter the premises because there was no effective consent for him to enter the financial office. See id. § 39-14-402(a)(1) (criminalizing the entry of a building or "any portion thereof" without effective consent and with intent to commit certain crimes).

**B.    July 11, 2008 Burglary**
With respect to the July 2008 burglary, the evidence included photographs of damage to the lock area and doorknob of an office door with a sign marked "Secretary's Office." Ms. Mitchell testified that she locked the office when she left at 4:00 p.m. on July 11 before discovering on July 12 that there had been an intrusion. She said a radio was missing from her office on July 12. She said the Defendant did not have authorization to use the computer on which the Palm Pilot program with his name was found.

The evidence is sufficient to support this conviction. Although the Defendant had access to a key to the secretary's office, his authority to use it was for assisting his parents with maintenance and custodial duties. The office was locked on the afternoon of July 11, even though other areas of the church may have remained accessible without a key. Further, the office was entered forcibly, not with a key, as evidenced by the damage to the door and doorknob. The Defendant exceeded the scope of his consent to be in the secretary's office when he entered forcibly and committed a theft. He is not entitled to relief.

We distinguish this case from previous decisions in which the defendant entered an open business and committed a crime but could not be convicted of burglary. See State v. Ferguson, 229 S.W.3d 312 (Tenn. Crim. App. 2007); State v. Michael Flamini, No. E2008-00418-CCA-R3-CD, Knox County (Tenn. Crim. App. May 26, 2009). In Ferguson, the defendant stole money from coin-operated machines in a laundromat, and in Flamini, the defendant robbed the clerk at a convenience store. In both cases, this court noted that the businesses were open to the public when the crimes occurred and held that the defendants could not be guilty of burglary because they had effective consent to enter the businesses. In the present case, the financial office and secretary's office at the church were kept locked when not in use, meaning they were not accessible to members of the public who attended church services or functions, unlike the retail areas of the landromat and convenience store in Ferguson and Flamini. The proof shows that access to the two offices was limited, that

the Defendant entered them without effective consent, and that the Defendant committed thefts from the offices. The evidence is sufficient to support his convictions for two counts of burglary.

## II

The Defendant contends that the trial court erred in imposing an effective twenty-one-year sentence for the convictions. The State defends the sentence as proper. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2010); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

At the sentencing hearing, the parties stipulated that the Defendant qualified as a Range II offender. The presentence report reflected that according to Department of Correction records, the thirty-year-old Defendant dropped out of school in the eleventh grade. He told the presentence report preparer that he graduated from Jackson Central Merry High School, but his mother said he received a diploma while incarcerated. The Defendant denied illegal drug use, although he admitted using marijuana once or twice. He reported that he drank beer occasionally. He was the father of a five-year-old girl. He had work experience as a stocker at a home improvement store, driving a forklift, and in construction.

The presentence report detailed the Defendant's criminal history spanning his adult life. The Defendant was on probation for two counts of theft of property of $1000 or more but less than $10,000 at the time of the offenses in this case. He also had prior convictions for attempted aggravated robbery, attempted felony escape, criminal impersonation, possession of a weapon with the intent to go armed, fraudulent use of a credit card of at least $1000 or more but less than $10,000, misdemeanor theft, aggravated burglary, three speeding offenses, two counts of driving on a revoked license, and driving on a suspended license. A capias was issued for the Defendant's failure to appear. His community corrections sentence for a prior offense was revoked in 2000, and his parole for prior offenses was revoked in 2004 and 2008.

The Defendant testified and admitted he cashed the checks. He said he used some of the money "to try to get to [his] daughter" and some of it to pay fines. He said he and Reverend Brock discussed a plan for the Defendant to work for the church as a method of restitution. He said, however, he was told he could not begin the arrangement until the court approved it. He acknowledged he had not done anything voluntarily for the church since the conversation with Reverend Brock but said he was advised he was not allowed on the church's property. He later testified that no one from the church told him he was unwelcome on the property.

The Defendant testified that he performed mowing and painting work for the church and that he set up for events such as weddings and funerals at the church. He acknowledged that he was paid for his labor. He said he had "a key" but claimed he was not in town when the burglaries occurred. He denied any responsibility for the burglaries. He admitted committing the forgeries.

The Defendant requested a community corrections sentence. He acknowledged that his parole was violated based upon the present offenses. He assured the court that he wanted to do anything possible to work, stay out of prison, and devote himself to his family. He said he and Reverend Brock discussed beginning a basketball league at the church to be supervised by the Defendant and his father. He apologized for the offenses and asked for a second chance.

Rosetta Mitchell testified that she knew the Defendant and his family from church. She said that the Defendant attended church services with his parents at one time and that he painted, mowed, and did other work at the church. She said the Defendant was a hard worker. She did not believe he burglarized the church. She said there were other men convicted of burglaries at the church.

Maurice Hunt testified that the Defendant had helped him move the stage and set up for events at the church. He said he never had a problem with the Defendant's work ethic and had no hesitation about being around the Defendant. He said he had never seen the Defendant act violently. The events of the present case surprised him. He did not believe the Defendant broke into the church. He noted that he had called the Defendant to lock the church after events and said that the Defendant would have no need to break into the church. He said the Defendant was from a good family.

Sarah March testified that she hoped the court would sentence the Defendant to probation in order for the Defendant to work and repay the church. She believed the Defendant could improve his life. She said that the Defendant's involvement with the church had positively affected him and that she thought it would influence his future decisions. She

said Reverend Brock told her he would have attended the Defendant's sentencing hearing but had to undergo medical treatment. She said that in her conversations with Reverend Brock, she never had the feeling the Defendant was unwelcome at the church.

With respect to the enhancement factors, the trial court noted the Defendant's extensive criminal history in addition to the number of offenses necessary to qualify him for Range II sentencing. See T.C.A. § 40-35-114(1) (2010). The court also noted that the Defendant had failed to comply with conditions of release and that the Defendant was on parole or probation for theft offenses when he committed the present offenses. Id. § 40-35-114(8), (13). The trial court stated that it found no mitigating factors. The trial court sentenced the Defendant as a Range II offender to a seven-year sentence for each of the burglary and Class D felony forgery convictions, four years for the Class E felony forgery, eleven months and twenty-nine days for theft, and six months for attempted theft. The court noted that consecutive sentencing was mandatory because the offenses were committed while on parole. The court also stated that consecutive sentencing was supported because:

> [T]his Defendant has an extensive criminal record, and he has failed to conform his conduct over the course of his life when given opportunities, and he goes back and does it again, and that's the purpose of consecutive sentencing, to protect society from his habitualness in coming back to commit criminal offenses.

The court ordered that the two burglary counts and the forgery count for check number 9790 should be served consecutively, with concurrent service of the remaining sentences. Each of the three sentences ordered to be served consecutively was for seven years, for a total of twenty-one years, but the trial court stated, "Total effective sentence is nineteen years." The court ordered restitution of the amounts of the forged checks and any damages caused by the burglary and stated that those amounts should be supplied when the judgments were prepared. The court ordered the assistant district attorney general to prepare the judgments.

After the sentence was imposed, defense counsel inquired of the court why it did not find as a mitigating factor that the offense neither caused or threatened serious bodily injury. The court responded:

> Well that would apply in this case as far as I'm concerned, you're correct. That could be taken into consideration. That's why he didn't get 8 years and he got 7 I guess, as far as the actual sentence.

-13-

> . . .
>
> And the mitigating factors were not in the file. I don't know when you filed them, but I didn't actually have them here to consider. I had to rely on what you said. You might want to check the file and see if they actually got filed.

The attorneys' arguments are not included in the transcript of the sentencing hearing. The record contains, however, a copy of the Defendant's Notice of Mitigating Factors filed three days before the sentencing hearing. The Defendant requested in the notice that the trial court find mitigating factors (1) and (13), that the Defendant's conduct did not cause or threaten serious bodily injury, and "[a]ny other factor consistent with the purposes of this chapter." See T.C.A. § 40-35-113(1), (13) (2010). The notice did not specify the facts supporting the application of mitigating factor (13).

## A.    **Application of Mitigating and Enhancement Factors**

The Defendant concedes that enhancement factor (1) related to his prior history of criminal convictions was supported by the proof. He challenges the trial court's application of factors (8) and (13), arguing that the court improperly relied on the single fact that he was on parole when he committed the offenses to support both factors. The presentence report reflects that the Defendant was convicted of two counts of theft on March 14, 2005, and received a four-year sentence for each. The offenses in this case were committed in June and July 2008. The report also states that the Defendant had a community corrections sentence revoked in 2000 and parole revoked in 2004 and on August 26, 2008.

The Defendant argues that the trial court could not rely upon the 2008 parole revocation to support both factors (8) and (13)(B). Enhancement factor (8) is applicable when "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." Id. § 40-35-114(8) (2010). Enhancement factor (13)(B) applies when "[a]t the time the felony was committed, one (1) of the following classifications was applicable to the defendant: . . . [r]eleased on parole." Id. § 40-25-114(13)(B). The two factors do not require that the same circumstances exist. They apply depending upon the facts of the particular case. Cf. State v. Dean, 76 S.W.3d 352, 380 (Tenn. Crim. App. 2001) (holding that enhancement factor (8) did not apply where the presentence report noted that the Defendant was on parole but not the disposition of an alleged parole violation); State v. Mitchell Eads, No. E2006-02793-CCA-R3-CD, Claiborne County (Tenn. Crim. App. July 21, 2008) (applying factor (8) and distinguishing Dean on the basis of proof that the defendant was on community release and violated the terms of release), perm. app. denied (Tenn. Dec. 8, 2008). This court has said:

-14-

> [T]the fact that two related factors are both found to exist by virtue of the existence of the same fact or circumstance does not mean that the length of the sentence enhancement must be doubled in some mathematical fashion. It only means that the trial court is entitled to assess the proven degree of culpability and negative personal circumstances under both factors in determining an appropriate sentence.

State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995).

The record reflects that the Defendant's parole was revoked as a result of the present offenses. The Defendant had a total of three parole and community corrections revocations. The trial court did not err in applying this factor.

Factor (13)(B) required a finding that a defendant was on parole at the time of the offense. The Defendant acknowledges and the record supports the trial court's finding in this regard.

The Defendant also argues that the trial court erred in failing to apply mitigating factor (1) relative to the lack of actual or threatened serious bodily injury in the commission of the offenses. The record is contradictory with respect to the trial court's application of this factor in that the court stated twice when making its findings that no mitigating factors applied but later stated that the factor had been considered in setting the Defendant's seven-year sentences at that length, rather than the statutory maximum of eight years. We agree with the Defendant that this factor is supported by the record.

## B.     Length of Sentences

Turning to the sentence lengths, we conclude that the trial court followed the statutory procedures in arriving at the sentences. The record reflects that the trial court was swayed to impose sentences near the top of Range II based upon the Defendant's significant record of prior criminal activity and his previous failures to comply with the conditions of sentences involving community release. Although the trial court erred to the extent it failed to apply mitigating factor (1), the court acknowledged that it had considered the lack of actual or threatened bodily injury in setting the sentences below the maximum in the range. Further, any mitigation afforded by factor (1) is minimal in comparison to the great weight the trial court placed on the enhancement factors. The Defendant has not shown that the lengths of his sentences are inappropriate.

## C.    Consecutive Sentencing

The Defendant argues that the trial court erred in imposing consecutive service for three of the seven-year sentences.  The State argues that consecutive sentences were proper.  We agree with the State.

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion.  State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997).  Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115 (2010), which states in pertinent part:

> (a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.
>
> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . .
>
> (2) The defendant is an offender whose record of criminal activity is extensive.

The Defendant argues first that the trial court failed to base its consecutive sentencing determination on any of the statutory factors.  While the trial court did not specifically state the statutory provision upon which it based its ruling, it is apparent from the trial court's oral findings that the court considered the Defendant to be an offender whose record of criminal activity was extensive as contemplated by subsection 40-35-115(b)(2).  The record supports this determination.  As noted above, the Defendant's entire adult life has been plagued by criminal convictions.  Even though the Defendant's criminal history was taken into account by the parties' stipulation to Range II sentencing and the trial court's finding relative to prior criminal convictions to support enhancement factor (1), the Defendant's criminal history is sufficient to support consecutive sentencing.  We note, however, the trial court erroneously stated that the effective sentence for three seven-year sentences imposed consecutively was nineteen years, rather than twenty-one years.  This was an apparent miscalculation, because it is clear from the trial court's findings and the judgments that the court intended to sentence the Defendant to three consecutive seven-year terms.  The effective sentence is twenty-one years.

-16-

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE